PAUL HOFFMAN (SBN 71244)
**University of California, Irvine**
**School of Law**
**Civil Rights Litigation Clinic**
401 E. Peltason Driv, Ste. 1000
Irvine, CA 92697
(310) 717-7373
e. hoffpaul@aol.com

JOHN WASHINGTON (SBN 315991)
**Schonbrun Seplow Harris**
**Hoffman & Zeldes LLP**
200 Pier Ave. #226
Hermosa Beach, CA 90254
(310) 396-0731
e. jwashington@sshhzlaw.com
*Attorneys for Plaintiff,* Manuel Jackson

BROOKE WEITZMAN (SBN 301037)
bweitzman@eldrcenter.org
ANDREA SMITH (SBN 294163)
 asmith@eldrcenter.org
**Elder Law and Disability Rights**
**Center**
1535 E. 17TH ST., STE. 110
Santa Ana, CA 92705
Telephone: 714-617-5353
Fax: (714) 754-1306

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT COURT OF CALIFORNIA

| | |
|---|---|
| MANUEL JACKSON,<br><br>              Petitioner,<br><br>     vs.<br><br>DAVID M. SINGER, in his official capacity as U.S. Marshal for the Central District of California, and COLLETTE S. PETERS, in her official capacity as Director of Federal Bureau of Prisons. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     This action arises out of deliberate indifference to Plaintiff Manuel Jackson's serious medical needs for dental care.  Mr. Jackson is currently housed in the Metropolitan Detention Center-Los Angeles under the supervision and custody of Defendants Bureau of Prisons ("BOP") and U.S. Marshals Service ("USMS"). At all relevant times, Mr. Jackson has been in Defendants' custody, where he will remain for the foreseeable future in light of his sentencing.  For at least the last eight years, Defendants have been deliberately indifferent to Mr. Jackson's dental health, causing at least five of his teeth to progressively rot and crumble beyond repair. This has exposed him to numerous and potentially lethal infections.  By all indications, this deliberate indifference will continue absent the Court's intervention for the many years Plaintiff will remain in custody.

2.     Beginning in 2015, Mr. Jackson's dental health began to deteriorate once Defendants would not allow him even solution to clean his partial dentures—basic care necessary to prevent the loss of his teeth and dangerous bacterial infections.  Mr. Jackson complained of this for years as his infections and his teeth loss progressed to the point that he has lost five teeth and is at risk of losing more. Having denied Mr. Jackson basic care and needlessly caused this loss, Defendants now propose that at most, they will remove all of his teeth – including his healthy ones – rather than pay for implants, rendering him toothless and only with dentures and once again, presumably, refusing him the solution to clean the dentures.  As several dentists have stated, this is not a long-term solution nor one for a person in Mr. Jackson's position.

3.     Mr. Jackson continues to live in excruciating pain, with deteriorating conditions that prevent him from being able to properly speak and eat.  This could be mitigated by immediate access to surgical implants and follow-up care as directed by the dentist.  Plaintiff brings this action for injunctive relief, that an impartial dentist examine Mr. Jackson's condition – as the Court recommended in

its fourth order concerning this matter and which Defendants have ignored for the past fourteen months, *see United States of America v. Manuel Larry Jackson,* No. 2:14-cr-00684-CAS (C.D. Cal., filed Aug. 23, 2022) (recommending that Mr. Jackson be transported to the University of California for an evaluation by a prosthodontist within 30 days) – and recommend appropriate treatment, and that Mr. Jackson's teeth be replaced rather than removed entirely.

## JURISDICTION AND VENUE

4.     This is an action for injunctive relief and a declaratory judgment pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202, and Rule 57 of the Federal Rules of Civil Procedure.  This court has subject matter jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. § 1331 in that the action arises under the Eighth Amendment to the United States Constitution.

5.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) and (e) in that (1) the unlawful actions challenged herein occurred in the Central District of California, and (2) the Defendants in this action are officers of agencies of the United States who are situated in or oversee and manage the facilities where a substantial part of the events and omissions giving rise to the Plaintiff's claims occurred in the Central District.

## PARTIES

6.     Manuel Jackson brings this action individually.  Mr. Jackson is an inmate in the custody and control of the Federal Bureau of Prisons ("BOP") and the United States Marshals Service ("USMS").  Mr. Jackson is under the supervision and custody of Defendants BOP and USMS and is currently housed in the Metropolitan Detention Center-Los Angeles ("MDC-LA").  For the past seven years he has experienced progressive tooth decay and oral infections as a result of Defendants' refusal to provide him basic care.

7.     The USMS assumes custody of individuals arrested by all federal agencies and is responsible for the living needs and transportation of prisoners from

their detention. Defendant David M. Singer is the U.S. Marshal for the Central District of California. Defendant Singer is sued in his official capacity.

8. The BOP is an agency of the United States Department of Justice. The BOP oversees the custody and care of sentenced federal inmates, pretrial detainees, and pre-sentenced offenders housed in BOP facilities on behalf of USMS. Defendant Collette Peters is the Director of the BOP and oversees the operation of BOP facilities and offices, including several federal detention facilities Plaintiff has been under the custody and care of since 2015. Defendant Peters is sued in her official capacity.

## FACTUAL ALLEGATIONS

9. Mr. Jackson has been incarcerated since July of 2013.

10. In 2014, Mr. Jackson and his family paid approximately $2,000 to provide basic dental care for Mr. Jackson. This dental care entailed two partial dentures, in addition to an implant and crown necessary to anchor the dentures.

11. Beginning in 2015, Mr. Jackson's dental condition began to deteriorate at CDC-San Bernadino ("CDC-SB"). At that time, Mr. Jackson was denied denture cleaning solution at CDC-SB. Mr. Jackson was then transferred to Santa Ana City Jail later that year, where he was only sporadically provided denture cleaning materials. Without regular access to denture cleaning materials, Mr. Jackson was forced to wash them with soap and toothpaste.

12. As UCLA dentist Dr. Felsenfield testified, soap and toothpaste are abrasive and thus ineffective in maintaining dentures. The lack of access to appropriate denture cleaning materials and resulting use of soap and toothpaste leads to dentures harboring bacteria and infecting the entire mouth, beginning with the adjacent teeth. As Dr. Felsenfield further testified, the lack of denture cleaning materials caused Mr. Jackson's teeth to decay beyond repair, beginning with the teeth adjacent to his dentures and progressing from there.

13.     By early 2016, the progressive deterioration of Mr. Jackson's teeth caused pain extreme enough that it was interfering with his ability to eat.  His gums were constantly swollen and tender.  He sought a court order through his Federal Defender to address his deteriorating mouth and pain.

14.     The Court ordered a medical consultation with a licensed Doctor of Medicine on February 17, 2016.  *See United States of America v. Manuel Larry Jackson,* No. 2:13-cr-00484-CAS (C.D. Cal., Filed Feb. 17, 2016).

15.     Mr. Jackson was taken to a Doctor who recommended a dental implant to improve Mr. Jackson's dentition and address his suffering.  USMS denied the treatment by March 2016.

16.     Mr. Jackson was transferred to MDC-LA soon after this denial of care, in July 2016.

17.     Upon arrival at MDC-LA, Mr. Jackson reported to officials the ongoing worsening of a cavity on the outside of the tooth holding the partial denture in place.  He was denied denture cleanser for five months.  In August of 2016, Mr. Jackson was able to buy his own denture cleaner.

18.     On September 2, 2016, Mr. Jackson reported pain and a broken canine tooth, #13, which was holding the partial denture.  The dentist attempted to repair the surface of the tooth where it touches his cheek for temporary relief and noted Mr. Jackson has suffered bone loss.

19.     Mr. Jackson's dental decay and pain continued, resulting in his seeking a second judicial recommendation for treatment.

20.     On November 2, 2016, the Court issued a second Order to the United States Marshals Service and MDC-LA, pending MDC-LA's approval, to provide a "dental examination and treatment that includes a permanent replacement" for Mr. Jackson's #13 tooth "so that he will no longer have to rely on the non-permanent

'flipper.'"[1] *See United States of America v. Rodriguez-Landa et al.,* No. 2:13-cr-00484-CAS (C.D. Cal., Filed Nov. 2, 2016).

21.     Mr. Jackson never received the treatment.  Instead, Mr. Jackson was transferred back to CDC-SB.

22.     Rather than receive the court-ordered treatment at CDC-SB, Mr. Jackson's problems were compounded when he was not allowed to purchase denture cleanser for himself at CDC-SB.  Shortly after his arrival, in February of 2017, Mr. Jackson requested that Dr. Bernstine, the facility's contract dentist, help him obtain denture cleanser.  Dr. Bernstine provided Mr. Jackson with dental cleaning materials sufficient for a two-month period.

23.     The cleansing supplies ran out.  In April 2017, Mr. Jackson requested more denture cleanser.  Dr. Bernstine would not provide any.  The stated rationale was that inmates could potentially use their denture cleanser to escape the prison.  There is no scientific basis for this reason, nor was there any suggestion that Mr. Jackson had even any intent or ability to try to use denture cleanser to escape.

24.     In June 2017, Dr. Bernstine provided an implant and crown, for which Mr. Jackson had to pay $1,200.

25.     Mr. Jackson was again instructed to use soap and water or toothpaste to clean his partial dentures.

26.     On June 16, 2017, Mr. Jackson reported in a Health Service request that the tooth that Dr. Bernstine had replaced by an implant had broken in half.

27.     On June 18, 2017, Mr. Jackson reported in a Health Service request that the screw was exposed where his tooth had been replaced by an implant.

28.     These requests were ignored.  Eventually the tooth, left untreated, crumbled and fell out.  An infection continued spreading through his entire mouth.

---

[1] A "flipper" is a removable partial denture.

29.     On January 22, 2018, Mr. Jackson reported in a Health Service request that he was in significant pain from his dental decay.  The next day, he submitted a request to be seen by a dentist rather than a Physician Assistant, given the extremity of the decay.

30.     On March 24, 2018, Mr. Jackson requested denture cleanser in a Health Service Request.  On March 27, 2017, he again requested denture cleanser in a Health Service Request.  The request was apparently forwarded to Dental.

31.     Mr. Jackson never received denture cleanser. Again on June 7, 2018, Mr. Jackson submitted a Health Service Request for denture cleanser.

32.     On July 6, 2018, Mr. Jackson submitted yet another Health Service Request for denture cleanser, which was again apparently forwarded to Dental.

33.     On July 14, 2018, and July 16, 2018, Mr. Jackson submitted more requests, emphasizing that the BOP's denial of denture cleaner was an ongoing issue.  Mr. Jackson was informed that he should brush his dentures instead of using denture cleanser.  Mr. Jackson sent several related requests through August, January, and February of 2019.

34.     Between January 2018 and February 2019, Mr. Jackson submitted at least ten written Health Service Requests for dental treatment and proper denture cleanser.  He reported that he was in "PAIN, PAIN, PAIN!!!!!!"

35.     On March 6, 2019, Mr. Jackson went for dental treatment at CDC-SB, reporting to Dr. Richie Tran that the teeth next to his partial dentures were now rotting and had several cavities because of his inability to clean his dentures properly with denture solution.  The dentist observed that Teeth #5, #7, and #29 had decayed to the point that they could not be restored, thus causing the infection to continue to spread.  Between 2018 and 2019, Mr. Jackson had two dental appointments where dentists observed the state of his mouth and his decayed teeth.  Mr. Jackson reiterated to Dr. Tran that he had a court order that had been ignored

by the BOP for three years and requested a private exam, given the neglect he had received by the BOP.

36.     Around this same time, another dentist at CDC-SB noted Mr. Jackson had two visibly decayed front teeth which had chipped away piece by piece. However, neither of the CDC-SB dentists examining Mr. Jackson between 2018 and 2019 examined the denture for cleanliness.  Nor did they address Mr. Jackson's concern that his inability to properly clean the denture caused the decay.  Neither dentist provided dental treatment beyond extractions, nor did they provide appropriate cleaning materials.  Mr. Jackson's mouth continued to decay, and his symptoms, including excruciating pain, continued.

37.     As Mr. Jackson's teeth were rapidly decaying between 2018 and 2019, Mr. Jackson was repeatedly told that he could handle this, in language implying that he could tough it out as he was a gang member.  Mr. Jackson was informed that the only treatment he would be provided was pulling more teeth.

38.     On March 8, 2019, the Court issued a third judicial recommendation for CDC-SB and USMS to provide Jackson with dental treatment and access to appropriate cleaning materials for partial dentures.  *See* Criminal Minutes – General, No. 2:13-cr-00484-CAS (C.D. Cal., filed March 8, 2019).

39.     On March 22, 2019, Mr. Jackson underwent an evaluation by a private dentist, Dr. Habjan, who noted multiple teeth with extensive decay.

40.     March 26, 2019 was the first day of Mr. Jackson's criminal trial in *USA v. Rodriguez-Landa*, et al. (CR 13-484-CAS).  On March 27, 2019, Mr. Jackson was transferred from CDC-SB to MDC-LA without prior notice.  During the transfer, Mr. Jackson's partial dentures went missing while under the care of the BOP and the USMS.  Many items, including Mr. Jackson's personally financed partial dentures, have never been recovered.  As a result, he has tremendous difficulty eating and speaking—food now falls through his mouth, and he cannot speak without spitting at others.

41.     During his trial in the above case, Jackson had difficulty staying alert due to his dental crisis and further was unable to clearly enunciate his words. Jackson lost about 25 pounds from malnourishment because he cannot properly chew food.  Mr. Jackson's trial ended on May 7, 2019.

42.     On May 20, 2019, MDC-LA staff dentist Dr. Shon performed some restorative work on two of Mr. Jackson's teeth.  Dr. Shon advised Mr. Jackson that the restorative work was only temporary and permanent restorations were needed as soon as possible.

43.     Because the only permanent solution being offered to Mr. Jackson was complete extractions (without specification as to whether he would receive any dental prosthesis for extracted teeth), the BOP claimed that Mr. Jackson began to refuse dental care from the BOP.  Subsequently, on November 4, 2019, Mr. Jackson stated in a refusal of examination form that he was not rejecting treatment but rather was awaiting proper medical treatment.  Mr. Jackson was concerned because the solutions being proposed involved him losing his healthy teeth, with no attempts to preserve them.  He additionally reiterated that BOP refused to provide proper cleanser for the dentures he did have, resulting in dental infections.  More dentures were likely then to exacerbate Mr. Jackson's dental crisis given BOP's refusal to provide proper denture care.

44.     On November 14, 2019, CDC-SB Dr. Richie Tran recommended extraction and implants and completed a referral for Mr. Jackson to see a private doctor.

45.     Mr. Jackson was again informed that if he wanted anything other than CDC-SB pulling more of his teeth, he must seek a private doctor.  On November 15, 2019, Mr. Jackson requested a private dental consult as instructed.  The request was denied.

46.     During 2019, Mr. Jackson was briefly transferred back to CDC-SB, and then to West Valley Detention Center.

47.     On March 2, 2020, the Court issued a court order for the USMS to transport Plaintiff to UCLA for an independent dental evaluation to determine "what, if any, dental prostheses may be appropriate" for his now four decayed and fractured teeth.  *See* Criminal Minutes – General, No. 2:14-cr-00684-CAS (C.D. Cal., filed March 2, 2020).

48.     Mr. Jackson was not provided this evaluation for over a year until he was scheduled for an evaluation in May of 2021.

49.     During this time, in July 2020, Mr. Jackson's crown was also dislodged from his tooth.  Beginning June 17, Mr. Jackson requested that it be glued back onto his tooth, submitting at least eight requests and even offering to glue it on himself with super glue if it could be provided.

50.     Mr. Jackson's cap was not replaced until on or around August 8, 2020.

51.     As Mr. Jackson had developed a severe mouth infection, he requested dental treatment on August 25, 2020.  He was informed he would not receive treatment because of the COVID pandemic.

52.      In the meantime, Mr. Jackson continued to suffer from excruciating pain as his teeth further decayed.

53.     After it was made clear to the BOP Health Services on April 19, 2021 that Mr. Jackson was going to receive his UCLA dental exam soon, MDC-LA scheduled a dental evaluation with its own staff dentist, Dr. Shon, to precede the UCLA evaluation.  On April 21, 2021, Dr. Shon evaluated Mr. Jackson in the first comprehensive examination Mr. Jackson received in the preceding seven years.  Dr. Shon proposed the MDC-LA proposed treatment plan, which called only for the removal of nine of Mr. Jackson's teeth and a partial denture.  This treatment plan failed to include any opinion concerning whether this treatment was suitable for Mr. Jackson given his long-term custodial status, whether he would lose remaining teeth, and whether extraction would be preferable to dental implants.

54. Finally, on May 4, 2021, Dr. Ali Salehpour, Resident Physician at UCLA's Oral & Maxillofacial Surgery Clinic, evaluated Mr. Jackson. Dr. Salehpour observed at least four teeth that had decayed to the point where they were beyond repair, noting that it affected his ability to speak and eat solid foods. His OMS Consult Report provided the following recommended treatment plan:

> Given [the] extent of decay and fractures in addition to bone reception, he will need a combination of extractions, bone grafts, and implants with implant crowns to rehabilitate his dentition. Specifically, he will need extractions and single tooth implants of teeth #7, #8, #9 and #10 along with bone grafting to augment the ridge. He will also need extraction of #15 residual root tips as these are a nidus for future infection as well as bone grafting given the amount of bone reception already present.

*See* Defendant Manual Jackson's Supplementary Materials in Support of his *Ex Parte* Application for Recommendation to Receive Dental Extractions and Implants at the Government's Expense (Aug. 6, 2021, Page 5).

55. Dr. Salehpour opined that implants are not a viable "long-term prosthetic option for Mr. Jackson, given his long custodial term with limited access to dental treatment beyond basic cleanings/fillings." *Id.* Dr. Salehpour further explained: "The benefit of implants, given his long custodial sentence, are that they can be maintained for many years with basic cleanings and good oral hygiene without significant bone loss. Implants have excellent long-term prognosis and can be expected in many cases to last for > [greater than] 20 years." *Id.* A fixed partial denture would not be a comparable long-term solution, in that it would cause bone loss of the four decayed teeth; that it "requires other teeth for support," so cavities or other damage on the supporting teeth could compromise the entire prosthesis; and that keeping dentures clean and making sure they are not damaged in this way

can be "a challenge in his custodial status." *Id.* Similar issues would be true for full dentures; without the ability to properly care for them, dentures could continue to promote dental infections and bone loss; in addition, they would involve extracting Mr. Jackson's healthy teeth.

56.    Mr. Jackson has already been sentenced to twenty years in one case. He will be transferred to yet another BOP facility to serve that sentence, and will soon be sentenced in a pending case, CR 14-684-CAS. Although providing Mr. Jackson yet another denture may be more cost-effective, it is not a reliable long-term solution. A solution that does not depend on availability of dental cleanser to Mr. Jackson is required.

57.    On August 11, 2021, the BOP opposed Dr. Salehpour's recommendation for implants on the basis that Mr. Jackson needed a second opinion from a prosthodontist. The BOP claimed, without any evidence, that Dr. Salehpour could be biased in favor of dental implants since he was a dental surgeon.

58.    On August 20, 2021, one of Mr. Jackson's criminal defense attorneys at the time, Melissa Austen, provided AUSA Chris Kendall and MDC-LA attorney Audrey Lambert with a *Touhy* request seeking to interview Dr. Shon about the MDC-LA Proposed Treatment Plan. As explained in the request, Ms. Austen sought to question Dr. Shon about: (1) whether any government employee urged or instructed Dr. Shon to recommend a partial denture; (2) Dr. Shon's reasons for recommending a partial denture; (3) whether there was concern about Mr. Jackson's mouth being able to support a partial denture, now or in the future, given Mr. Jackson's continuous bone loss and long-term custodial status; and (4) whether Dr. Shon weighed the advantages or disadvantages of a partial denture versus other treatments, including dental implants, when forming his treatment plan. Dr. Shon was the only government dentist to personally examine Mr. Jackson's mouth for creating the MDC-LA Proposed Treatment Plan.

59.    The government refused to grant the *Touhy* request.  Instead, the BOP had Dr. Nicholas Makrides, a BOP dentist who was out of state and had never examined Mr. Jackson, confirm the treatment plan.  The BOP had another BOP dentist review the plan, given that Dr. Shon requested that the plan's reasonableness be reassessed.

60.    On January 11, 2022, Mr. Jackson was offered treatment consistent with Makrides' treatment plan.  Mr. Jackson requested to speak with his lawyer and was informed "that was not going to happen."  Mr. Jackson was removed from the routine care list and was instructed to let the BOP know if he wished to change his mind and proceed with the dental plan.

61.    On October 6, 2022, Mr. Jackson was examined by Dara Barron, DMD, who similarly stated that Mr. Jackson should receive only extractions and dentures rather than implants.

62.    On October 14, 2021, Dr. Alan Felsenfeld, an UCLA Oral and Maxillofacial Surgery Specialist, who had served as a faculty member for approximately forty years, signed a declaration advising against treating Mr. Jackson with a partial denture in support of Jackson's Ex Parte Motion that he receive the dental care prescribed by UCLA.  CR 14-684-CAS.

63.    Dr. Felsenfeld also wrote that he advised dental implants, confirming again that it is a short-term solution, and that by the time a partial denture failed or created damage to the jaws, there may be too little bone remaining in Mr. Jackson's mouth to restore the dentures without additional and extensive bone grafting and reconstruction – meaning that Mr. Jackson would be left without a reliable prosthesis, as the bone would be insufficient to support a denture or implants.  As Dr. Felsenfeld noted, a dental implant would last, and is no different from regular teeth in requiring only brushing and flossing, rather than denture solution and additional care.

64.     To allay any purported concerns that Dr. Salehpour and Dr. Felsenfeld could be biased in favor of implants, Ms. Austen coordinated for a UCLA prosthodontist to conduct an independent evaluation and provide an opinion about the most suitable prosthetic dental treatment plan for Mr. Jackson and the relative advantages and disadvantages of denture and implant options.

65.     On August 23, 2022, the court issued a recommendation that stated: "the United States Marshals Service transport Defendant Manuel Jackson to the University of California, Los Angeles, for a Prosthodontist Evaluation within the next thirty (30) days." *See United States of America v. Manuel Larry Jackson,* No. 2:14-cr-00684-CAS (C.D. Cal., filed Aug. 23, 2022). The UCLA prosthodontist opinion would help the court to decide what, if any, dental treatment should be recommended. For the last fourteen months, this recommendation has not been complied with.

66.     On August 29, 2022, Melissa Austen began an email correspondence with USMS, asking when Mr. Jackson would receive his exam with UCLA. By September 15, 2022, Gloria Hernandez from the USMS said that it was not responsible for Mr. Jackson's transfer to UCLA and that his care was the responsibility of MDC-LA.

67.     On September 19, 2022, Christopher Kendall, Assistant United States Attorney, emailed Melissa Austen and informed her that the BOP would not comply with the court order. MDC-LA's dental staff allegedly found that the visit to UCLA was not medically necessary.

68.     On September 19, 2022, Ms. Austen responded to Mr. Kendall and explained that Mr. Jackson is under USMS custody and further asserted that it was the USMS who had coordinated the first UCLA evaluation. She advised that it did not seem appropriate for MDC-LA's dental staff to decide whether the judicial recommendation should be followed. Ms. Austen also stated the judicial recommendation for the UCLA prosthodontist's evaluation was responsive to the

government's belief that a prosthodontist should render Mr. Jackson's second opinion.

69.    Mr. Kendall responded to Ms. Austen on October 20, 2022, stating that the BOP's prosthodontist, Dr. Barron, had examined Mr. Jackson and that a second opinion from UCLA was not necessary.  Dr. Barron's evaluation was based solely on treatment notes and 17-month-old radiographs from Mr. Jackson's first UCLA evaluation on May 4, 2021.  Dr. Barron had never evaluated Mr. Jackson even though he had lost several teeth since the UCLA radiographs.  Dr. Barron, who acknowledged in her report that a new exam and x-rays were needed, opined that a full upper denture would be appropriate.

70.    Richard Kith of the USMS also emailed Melissa Austen on October 28, 2022, and stated that he concurred with the BOP position and would not allow Mr. Jackson to be examined by an independent prosthodontist.

71.    On October 28, 2022, Ms. Austen requested from Mr. Kendall clarification as to whether Dr. Barron's recommendation required full extraction of Mr. Jackson's upper teeth, including healthy teeth.  She also asked why MDC-LA was allowed to decline Mr. Jackson's transport to UCLA given that he was under USMS custody.  *See* AUSA Kendall Response to Reason no Updated Examination (Page 1).

72.    On October 28, 2022, Mr. Kendall confirmed that Dr. Barron's plan included extracting all of Mr. Jackson's upper teeth, including all of his healthy teeth.  Mr. Kendall stated:

> Inmates are not entitled to select their own clinician, and are not entitled to dictate the use of selected dental materials. The treating dentist will provide appropriate care to the scheduled inmate. If an inmate refuses all treatment by the assigned dentist refusal form will be completed and he/she will be removed from the routine treatment list. The

inmate will be eligible only for dental sick calls. If he/she requests comprehensive care at a later date, the inmate will be placed at the bottom of the list. Inmates are not permitted to use their own dentist, whether in the BOP clinic or the dentist's office, whether on a reimbursable or nonreimbursable [sic] basis, or whether there was a prior relationship between the inmate and the provider.

73.     By November 29, 2022, during a routine dental care visit, Dr. Shon reported that Mr. Jackson had multiple cavities and infected teeth. Mr. Jackson requested to have a consultation at an outside clinic to see his treatment options. Dr. Shon stated in his notes that he would send the patient out for a consultation. Jackson BOP Medical Records Part 2 (page 91). The consultation never occurred.

74.     To date, the BOP and USMS have refused to follow the judicial recommendation for Mr. Jackson to receive a UCLA prosthodontist evaluation.

75.     Because he was denied access to medical treatment and appropriate denture cleaning materials, Mr. Jackson has developed a mouth infection that first caused the outside of the teeth adjacent to his partial dentures to decay.

76.     Mr. Jackson continues to request the dental care he was prescribed, and the BOP continues to deny his requests.

77.     As of October 6, 2022, Mr. Jackson appears to be missing five teeth. Now, After more than four years of improper medical care, Mr. Jackson has experienced the increasing decay and deterioration of his teeth, in addition to recurring, potentially lethal, dental abscesses and near constant infections in his mouth. Mr. Jackson's decayed and fractured teeth, and any costs to repair them, were completely avoidable.

78.     Mr. Jackson's teeth are continuing to decay at a more rapid rate. He has no front teeth and is unable to eat without food falling through his mouth. He has lost so much weight that he no longer has the ability to exercise. His dental

pain is continually recorded by his BOP Medical Records as a 10 out of a 10. He has constant medical infections and is still unable to speak clearly.

79.    Mr. Jackson will be in federal custody for the foreseeable future. Without this Court's intervention, Mr. Jackson will be unable to obtain the dental procedure he desperately needs.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

80.    Since the installation of his first partial dentures in 2014, Mr. Jackson has transferred facilities at least five times.

81.    During this period, Mr. Jackson has initiated medical requests through Health Service Requests at least eight times since his incarceration, receiving no response. He has obtained four court orders and recommendations to obtain proper care, all of which have been defied by the MDC-LA, USMS, and the BOP. To date, the MDC-LA has refused to comply with a court recommendation for another examination.

## CLAIM FOR RELIEF
### Eighth Amendment to the U.S. Constitution
### (ALL DEFENDANTS)

82.    Plaintiff realleges and incorporates herein by reference the preceding and any subsequent paragraphs of this Complaint.

83.    Defendants have an obligation to provide medical care for Plaintiff.

84.    As alleged herein and above, Defendants' conduct violated Plaintiff's right to be free of cruel and unusual punishment under the Eighth Amendment of the United States Constitution, and to receive adequate medical care to prevent unnecessary pain and suffering. Defendants repeatedly denied Plaintiff, an inmate in the custody of the federal government since 2013, and who will remain an inmate in their custody for the foreseeable future, medically necessary care.

85.     Basic care, including denture cleaning solution and implants, would have prevented Plaintiff from unnecessary pain and suffering due to progressive infections and the loss of several teeth.

86.     Defendants have known of the need for this treatment for years.  There is a significant amount of documentation of Plaintiff's condition, both from his own numerous reports, his medical records, and the reports of several dentists.

87.     Defendants have for years refused basic cleaning solution and care for Plaintiff, predictably causing his current suffering and loss of teeth.  Having denied this care and caused this loss, Defendants have suggested that, at most, they will remove all his teeth, including his healthy ones, rather than pay for implants.  This is not a long-term or reasonable solution for a person in Mr. Jackson's position, who is suffering and will continue to suffer substantial pain and suffering if this situation is not corrected.

88.     Given the facts described in the preceding paragraphs, a substantial case and controversy exists of sufficient immediacy to warrant the issuance of a declaratory judgment and injunctive relief.  Plaintiff has suffered a significant injury because of the unlawful conduct complained of herein, which may be addressed by a favorable decision and injunction.

89.     Plaintiff seeks injunctive relief to ensure the needed dental care is provided.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgement against Defendants as follows:

1.    A declaratory judgment that Defendants' conduct violates Plaintiff's right to medical treatment;

2.    A preliminary and permanent injunction ordering Defendants to provide the independent evaluation the Court has recommended, address Plaintiff's medical needs, and schedule dental implants and any other appropriate relief.

4.    For attorneys' fees under 28 U.S.C. § 2412 and as otherwise provided by law; and

5.    For any other relief as the Court deems just and proper.

Dated: November 15, 2023            Respectfully submitted,

By: s/Paul Hoffman
Paul Hoffman
UNIVERSITY OF CALIFORNIA, IRVINE
SCHOOL OF LAW
CIVIL RIGHTS LITIGATION CLINIC

By: _____
Andrea Smith
Brooke Weitzman
ELDER LAW AND DISABILITY
RIGHTS CENTER